**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | | |
|---|---|---|
| MAERSK OIL TRADING AND INVESTMENTS A/S, | § | Civil Action Number |
| Plaintiff, | § | __:26-cv-_____________ |
| v. | § | In Admiralty Rule 9(h) |
| VALLOEBY PROSPERA LIMITED; and MT VS PROSPERA (IMO 9298313), her engines, tackle, equipment, and appurtenances, *in rem*, | § | JUDGE: |
| | § | MAGISTRATE: |
| Defendants. | § | |

**VERIFIED COMPLAINT**

Plaintiff Maersk Oil Trading and Investments A/S ("Maersk Oil Trading") files this Verified Complaint against Defendants Valloeby Prospera Limited ("Valloeby") and MT VS PROSPERA ("Vessel"), *in rem*, stating admiralty and maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure ("Rule 9(h)") and Rules B and C of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure ("Supplemental Rule B" or "Supplemental Rule C"), and alleges as follows:

**PARTIES**

1. Plaintiff Maersk Oil Trading is an *aktieselskab* established in Denmark.

2. Defendant Valloeby is registered under the laws of Isle of Man and is the registered owner of the Vessel as per Equasis (checked on October 22, 2026).

3. The Vessel is a crude oil tanker and, on information and belief, the Vessel will be present in or around the area of the port of Lake Charles, Louisiana on or about October 24, 2026, within this District and therefore within the jurisdiction of this Court and subject to process *quasi in rem* and *in rem* pursuant to Supplemental Rules B and C.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1333(1) because this action is an admiralty and maritime claim, arising from the breach of a maritime contract.

5. Venue is proper in the District pursuant to 28 U.S.C. § 1391(b)(2) and Supplemental Rule C.

6. This Court has power to order the attachment and arrest of the Vessel pursuant to Supplemental Rules B and C.

## FACTS

### I. Maritime Contract

7. As set forth in paragraph 2 above, at all times relevant, Valloeby was the registered owner of the Vessel.

8. On November 12, 2025, Maersk Oil Trading, acting through its Dutch branch, as charterers, and Maersk Tankers A/S ("Maersk Tankers"), as owners, entered into a voyage charterparty for the Vessel to carry crude oil and/or dirty petroleum products from Antwerp, Belgium to Balboa, Panama ("Charterparty").

9. On or about November 17, 2025, the Master of the Vessel signed a bill of lading on behalf of the Vessel's owner, thereby issuing the bill of lading to Glencore Energy UK Limited, as shipper, and to the order of Glencore Energy UK Limited, as consignee, for 51,485.585 metric tons of very low sulphur fuel oil ("Cargo"), which was loaded onboard the Vessel ("Bill of Lading").

10. The Bill of Lading incorporated certain terms, conditions and other provisions of the Charterparty.

11. Pursuant to the Bill of Lading, Valloeby agreed to carry the Cargo from Antwerp, Belgium to Panama for orders.

12. The Bill of Lading was endorsed to the order of Maersk Oil Trading by Glencore Energy UK Limited.

## II. <u>The Voyage</u>

13. On or about November 17, 2025, the Vessel commenced its laden voyage from Antwerp to Balboa, carrying the Cargo.

14. On or about and between December 1, 2025 and December 2, 2025, the Vessel's main engine suffered a breakdown.

15. On or about December 5, 2025, the Vessel became incapable of resuming its laden voyage.

16. The Vessel missed its booked transit for the Panama Canal on December 6, 2025.

17. On December 7, 2025, the Vessel was towed to Curaçao, arriving on December 9, 2025.

18. On December 10, 2025, Independent Maritime Consulting LLC ("Independent Maritime") conducted an initial survey of the Vessel at Curaçao.

19. On December 18, 2025, Independent Maritime issued a report, which

a. identified significant damage to the Vessel's main engine, to include the number 3 fuel pump and its components; and

b. estimated that the repairs to the Vessel would take between six and eight weeks.

20. On December 24, 2025, Valloeby revised the estimated repair period to up to four months.

21. On February 2, 2026, Valloeby stated that the date for completion for repairs was early/mid-May 2026.

22. On or about May 13, 2026, the Vessel recommenced its laden voyage.

23. On or about May 25, 2026, the Vessel arrived at Balboa, Panama.

24. On June 17, 2026, a further joint inspection of the damaged components of the Vessel's number 3 fuel pump was conducted at the Minton, Treharne & Davies Laboratory ("June Inspection").

25. On information and belief, the findings of the June Inspection support that Valloeby failed to exercise due diligence to provide a seaworthy vessel and maintain the Vessel and her machinery and equipment in good order and condition.

26. On July 11, 2026, the Vessel completed discharge of the Cargo at Balboa, Panama.

27. As a result of Valloeby's failure to exercise due diligence to provide a seaworthy vessel and maintain the main engine in good order and condition, the Vessel discharged the Cargo seven months after the main engine's breakdown.

**III. <u>The Cargo</u>**

28. To be marketable, the standard for sulphur content of very low sulphur fuel oil ("VLSFO") is not to exceed 0.5 percent by mass.

29. At loading in Antwerp, Belgium, AmSpec Belgium BVBA tested a sample of the Cargo.

30. The Certificate of Analysis produced by AmSpec, dated November 14, 2025, states that the sulphur content of the shore tank composite sample (which was drawn before loading on November 14, 2025) was 0.49 percent by mass.

31. The Certificate of Analysis produced by AmSpec, dated January 30, 2026, states that the sulphur content of the Vessel tank composite sample (which was drawn after loading on November 17, 2025), was 0.49 percent by mass.

32. While the Vessel was berthed at Curaçao and after the Vessel arrived at Balboa, Panama, samples of the Cargo taken between January 23, 2026 and June 25, 2026 were tested.

33. Each test result of the samples taken between January 23, 2026 and June 25, 2026 state that the sulphur content exceeded 0.5 percent by mass.

34. As a result of the handling of the Cargo while onboard the Vessel, the Cargo was discharged in poor condition in circumstances where the threshold for sulphur content for the Cargo to be marketable as VLSFO had been exceeded.

35. On information and belief, the poor condition of the Cargo at discharge was the result of the handling of the Cargo while onboard the Vessel or other fault of the Vessel and/or Valloeby.

**BREACH OF MARITIME CONTRACT**

36. The Hague-Visby Rules apply compulsorily to the Bill of Lading by reason of the shipment from Antwerp, Belgium.

**I. <u>Valloeby's Failure to Exercise Due Diligence to the Vessel</u>**

37. Article III, Rule 1(a) and (b) of the Hague-Visby Rules states,

> The carrier shall be bound before and at the beginning of the voyage to exercise due diligence to:
>
> (a) Make the ship seaworthy;
>
> (b) Properly man, equip and supply the ship;
>
> (c) Make the holds, refrigerating and cool chambers, and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage and preservation.

38. Accordingly, Valloeby was obliged before and at the beginning of the voyage to exercise due diligence to:

a. make the Vessel seaworthy; and

b. properly equip the Vessel.

39. The breakdown of the Vessel's main engine rendered the Vessel incapable of undertaking the voyage safely without repair.

40. Therefore, the Vessel was unseaworthy.

41. The nature of the breakdown to the main engine points to failings by Valloeby in its maintenance and proper care of the Vessel's main engine.

42. Therefore, Valloeby failed to properly equip the Vessel.

43. Accordingly, Valloeby breached its obligations under the Bill of Lading to Maersk Oil Trading.

**II. <u>Valloeby's Failure to Stow and Care for the Cargo</u>**

44. Article III, Rule 1(c) of the Hague-Visby Rules states,

> The carrier shall be bound before and at the beginning of the voyage to exercise due diligence to:
>
> . . .
>
> > (c) Make the holds, refrigerating and cool chambers, and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage and preservation.

45. Accordingly, Valloeby was obliged before and at the beginning of the voyage to exercise due diligence to make the parts of the Vessel in which the Cargo was to be carried fit for the reception, carriage, and preservation of the Cargo.

46. Article III, Rule 2 of the Hague-Visby Rules states,

> Subject to the provisions of Article IV, the carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried.

47. Accordingly, Valloeby was obliged to properly and carefully load, handle, stow, carry, keep, care for, and discharge the Cargo.

48. The Cargo was loaded in good condition with a sulphur content of 0.49 percent by mass.

49. The Cargo was shown to be in poor condition while held onboard and upon discharge from the Vessel with a sulphur content that exceeded 0.5 percent by mass.

50. Therefore, Valloeby failed to exercise due diligence to make the tanks which held the Cargo fit for preservation and/or to handle, stow, carry, keep, and/or care for the Cargo.

51. Accordingly, Valloeby breached its obligations under the Bill of Lading to Maersk Oil Trading.

**III. <u>Damages</u>**

52. As a result of Valloeby's breaches of its obligations under the Bill of Lading, Maersk Oil Trading has, to date, suffered estimated losses in the sum of USD 9,917,945.44, plus interest, costs, and attorneys' fees, comprising:

a. Hedging losses of USD 7,495,128.00, arising from transactions entered into by Maersk Oil Trading to hedge its position;

b. Costs incurred for cutting and blending the Cargo, which was undertaken by Maersk Oil Trading to bring the Cargo to a marketable condition following discharge, in the sum of USD 1,588,117.44; and

c. Tank fees incurred in the sum of USD 834,700.00 to store the Cargo and arrange for blending.

53. As a result of Valloeby's breaches of its obligations under the Bill of Lading, Maersk Oil Trading estimates that Maersk Oil Trading will incur USD 402,300 comprising costs and attorneys' fees for arbitration in London.

**SUPPLEMENTAL RULE B ALLEGATIONS**

**I. <u>Valloeby Cannot Be Found in the District</u>**

54. After diligent search, and as is set forth in the accompanying Declaration of Joseph F. Carilli, Jr., Valloeby cannot be found within the District for purposes of Supplemental Rule B.

55. Diligent searches of the website maintained by the Louisiana Secretary of State, an internet Whitepages directory, and the publicly available internet via Google did not identify Valloeby as:

a. ever being registered or authorized to transact business in the state of Louisiana;

b. having appointed an agent for service of process in this District; or

c. having any other presence in this District.

56. Further, Maersk Oil Trading is unaware of Valloeby having any general or managing agents in this District.

57. Accordingly, Valloeby cannot be found within this District within the meaning of Supplemental Rule B.

**II. <u>The Property of Valloeby will be in this District</u>**

58. Valloeby has or soon will have tangible property in this District.

59. On information and belief, the Vessel is expected to arrive in the Port of Lake Charles, Louisiana on or about October 24, 2026.

60. Accordingly, Maersk Oil Trading respectfully seeks to attach the Vessel pursuant to Supplemental Rule B as property located in this District belonging to Valloeby.

## SUPPLEMENTAL RULE C ALLEGATIONS

61. Maersk Oil Trading incorporates the foregoing allegations as though fully restated herein.

62. Maersk Oil Trading was the holder of a Bill of Lading for the Cargo.

63. As noted above, Valloeby breached its obligation under the Bill of Lading resulting in the creation of a maritime lien.

64. Accordingly, Maersk Oil Trading seeks to enforce its maritime lien directly against the Vessel *in rem*, pursuant to Supplemental Rule C.

## FIRST CAUSE OF ACTION
## ATTACHMENT OF TANGIBLE PROPERTY

65. Valloeby breached its maritime contractual obligations to Maersk Oil Trading.

66. The breach caused Maersk Oil Trading to suffer estimated damages of not less than USD 10,320,245.44, plus interest, costs, and attorneys' fees (which are recoverable under English law).

67. Maersk Oil Trading expressly reserves all its rights to have the underlying merits of its claims resolved in arbitration in London.

68. Maersk Oil Trading brings this action to obtain *quasi in rem* jurisdiction over Valloeby, and *in rem* jurisdiction over the Vessel, and security for the enforcement of any resulting awards and/or judgments which it may obtain against Valloeby.

69. Valloeby cannot be found within this District for the purposes of Supplemental Rule B, but the property of Valloeby, namely the Vessel, may, or soon will be found within this District.

70. Maersk Oil Trading is accordingly entitled to attach the property, namely the Vessel, pursuant Supplemental Rule B and arrest the Vessel pursuant to Supplemental Rule C.

71. Maersk Oil Trading seeks an Order from this Court directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Supplemental Rule B, attaching any and all assets of Valloeby up to the amount of USD 10,320,245.44, for the purpose of obtaining personal jurisdiction over Valloeby and to secure Maersk Oil Trading's claims, as described above.

72. Further, Maersk Oil Trading seeks an Order from this Court directing the Clerk of the Court to issue Process of Maritime Arrest pursuant to Supplemental Rule C, arresting the Vessel to secure Maersk Oil Trading's claims, as described above.

**WHEREFORE**, Maersk Oil Trading prays for the following:

(A) That process *in rem* pursuant to Supplemental Rule C be issued against the Vessel, her engines, tackle and apparel, etc., and that persons having or claiming any interest therein be cited to appear in and answer, under oath, all and singular the matters aforesaid, that the maritime lien arising out of breach of the Bill of Lading be declared to be a valid and subsisting lien upon the Vessel, her engines, tackle, apparel, etc., *in rem*, and that the said Vessel be seized and sold to satisfy all amounts owed to Maersk Oil Trading, as set forth herein;

(B) That because Valloeby cannot be found within this District pursuant to Supplemental Rule B, the Court issue an Order directing the Clerk of the Court to issue

Process of Maritime Attachment and Garnishment pursuant to Supplemental Rule B, attaching all property, tangible or intangible, in whatever form, in the amount of USD 10,320,245.44;

(C) That process in due form of law issue against Valloeby, citing them to appear and answer under oath all, and singular, the matters and claims set forth herein; and

(D) That this Court grant Maersk Oil Trading all such other and further relief which it may deem just and proper.

Dated: October 23, 2026

Respectfully submitted,

*/s/ Alexander J. DeGiulio*

Alexander J. DeGiulio (#38184)
Derek A. Walker (#13175)
**CHAFFE McCALL, L.L.P.**
1100 Poydras Street, Suite 2300
New Orleans, LA 70163-2300
504-585-7000 (Telephone)
504-544-6109 (Facsimile)
Email: Alex.DeGiulio@chaffe.com
walkerD@chaffe.com
***Attorneys for Maersk Oil Trading and Investments A/S***

**Of Counsel:**

Edward W. Floyd
Floyd Zadkovich (US) LLP
33 East 33rd Street, Suite 905
Telephone: (917) 999-6914
Email: ed.floyd@floydzad.com

***Counsel for Plaintiff Maersk Oil Trading and Investments A/S***